IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| L.D., individually and on behalf of K.D., a minor,<br><br>    Plaintiff,<br><br>v.<br><br>UNITEDHEALTHCARE INSURANCE, UNITED BEHAVIORAL HEALTH, and INSPERITY GROUP HEALTH PLAN,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:21-cv-00121-RJS-DBP<br><br>Chief Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

Defendants covered minor K.D.'s[1] stay in a residential treatment center (RTC) for a little over two months.  After Defendants determined residential treatment was no longer medically necessary, they stopped covering the treatment, and K.D.'s mother sued Defendants individually and on K.D.'s behalf.  The parties filed competing Motions for Summary Judgment, and the court heard argument on the Motions.  For the reasons explained below, both Motions are GRANTED in part and DENIED in part.

**BACKGROUND**[2]

The Insperity Group Health Plan (the Plan) is a fully insured welfare benefits plan

---

[1] The record indicates K.D. started using a gender-neutral name and they/them pronouns sometime in February 2019.  ECF 33, *Administrative Record* (*AR*) [SEALED] at 1152, 1251, 4167.  However, the parties and much of the record use K.D.'s given name and the pronouns she/her/hers.  *See, e.g.*, *AR* at 1503, 1651–52; ECF 38, *Plaintiffs' Motion for Summary Judgment* (*Plaintiffs' Motion*) [SEALED] at 3–19; ECF 59, *Defendants' Motion for Summary Judgment* (*Defendants' Motion*) [SEALED] at 10 n.42.  The court does not know K.D.'s preferences, so it will follow the parties' lead and use the initials "K.D." and the pronouns she/her/hers.

[2] Because the court is considering cross-motions for summary judgment, it presents a neutral summary of the facts.  *M.Z. v. Blue Cross Blue Shield of Ill.*, No. 1:20-cv-00184-RJS-CMR, 2023 WL 2634240, at *1 n.2 (D. Utah Mar. 24, 2023).  Unless otherwise indicated, the facts are not in dispute.

established for employees of Insperity Holdings, Inc.[3]  Insperity Holdings administers the Plan

along with UnitedHealthcare Insurance (United), which is the Plan's claims fiduciary.[4]  At all

relevant times, K.D.'s mother, L.D., was a participant in and K.D. was a beneficiary of the Plan.[5]

The court will first explain the Plan, then K.D.'s relevant medical history, and finally Plaintiffs'

administrative appeals.

### I.    The Plan

The Plan pays for treatment that is a Covered Health Care Service, medically necessary,

and not excluded.[6]  The Plan defines "medically necessary" as follows:

> [H]ealth care services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as determined by us or our designee.
>
> - In accordance with *Generally Accepted Standards of Medical Practice*.
>
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.
>
> - Not mainly for your convenience or that of your doctor or other health care provider.
>
> - Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.[7]

The Plan defines "Generally Accepted Standards of Medical Practice" as standards "based on

credible scientific evidence published in peer-reviewed medical literature generally recognized

---

[3] *AR* at 1868.

[4] *Id.*

[5] ECF 2, *Complaint* ¶ 3; *see also Plaintiffs' Motion* ¶ 3; ECF 47, *Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment* (*Defendants' Opposition*) [SEALED] at 4.

[6] *AR* at 1797.

[7] *AR* at 1802.

by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes."[8]

United used the Optum Level of Care Guidelines (LOC Guidelines) to review Plaintiffs' request for RTC benefits.[9]  Under the LOC Guidelines, admission to an RTC is appropriate when the following conditions are met:

- The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care.

    o Failure of treatment in a less intensive level of care is **not** a prerequisite for authorizing coverage.

        o The member's overall condition includes consideration of the acute and chronic symptoms and diagnoses in the member's history and presentation including co-occurring behavioral health or medical conditions, informed by the information collected by the provider following evaluation and treatment planning described in the Common Best Practices.  For children and adolescent members, evaluation of the appropriate treatment and level of care for a member's condition must account for the unique needs of children and adolescents, including age, developmental stage, and the pace at which they respond to treatment, as well as family, caregiver, school and other support systems.

    AND

- The member's condition can be safely, efficiently, and effectively assessed and/or treated

---

[8] *Id.*

[9] *See AR* at 15–44 (LOC Guidelines effective Feb. 12, 2019), 1651 (Feb. 13, 2019 denial letter citing LOC Guidelines), 1671 (Sept. 6, 2019 denial letter citing LOC Guidelines).  The Administrative Record contains two versions of the LOC Guidelines—one effective February 2018, *AR* at 1–14, and one effective February 12, 2019, *AR* at 15–44.  Defendants cite the 2019 version.  *Defendants' Motion* at 6.  In their Motion, Plaintiff's cite the 2018 version, but in later briefing, they cite the 2019 version for the Denial of Benefits claim. *Compare Plaintiffs' Motion* at 25–28, *with* ECF 48, *Opposition to Defendants' Motion for Summary Judgment* (*Plaintiffs' Opposition*) at 4 n.3.  From the denial letters, it is unclear which version the reviewers applied.  *See AR* 1651–53, 1671–73, 2091–93.  And although Plaintiffs' claim was denied effective February 11, 2019—when the 2018 version was still in effect—it is unclear whether subsequent reviewers applied the 2018 or 2019 version.  Because the parties do not argue there is a material difference between the two versions, the court cites the 2019 version when assessing the Denial of Benefits claim.  For the Parity Act claim, Plaintiffs cite the 2018 version and Defendants cite the 2019 version.  *See Plaintiffs' Motion* at 39–41; *Defendants' Motion* at 28.  Because Plaintiffs frame their claim via the 2018 version and the parties do not argue there is a material difference between the two, the court cites the 2018 version for the Parity Act claim.

in the proposed level of care.  Assessment and/or treatment of the member's condition require the intensity and scope of services provided in the proposed level of care.

AND

- Co-occurring behavioral health and medical conditions can be safely and effectively managed in the proposed level of care.

- Services are medical necessary[10] defined as:

    o  Consistent with generally accepted standards of clinical practice;

    o  Consistent with services backed by credible research soundly demonstrating that the service(s) will have a measurable and beneficial health outcome, and are therefore not considered experimental;

    o  Consistent with Optum's best practice guidelines;

    o  Clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks.

AND

- For all levels of care, services must be for the purpose of diagnostic study or reasonably be expected to improve the patient's condition.  The treatment must, at a minimum, be designed to reduce or control the patient's psychiatric symptoms so as to prevent relapse or hospitalization, and improve or maintain the patient's level of functioning.

        . . . .

AND

- Safe, efficient, effective assessment and/or treatment of the member's condition requires the structure of a 24-hour/seven days per week treatment setting.  Examples include the following:

    o  Impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.

    o  Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.[11]

---

[10] The LOC Guidelines note "[t]here may be variations of the definition of Medical Necessity according to unique contractual or regulatory requirements." *AR* at 16 n.2.

[11] *AR* at 16–17 (Common Criteria), 29 (RTC Admission Criteria).

4

The LOC Guidelines also set the criteria for a continued stay in an RTC:

- The admission criteria continue to be met and active treatment is being provided. For treatment to be considered "active," service(s) must be as follows:

  - Supervised and evaluated by the admitting provider;

  - Provided under an individualized treatment plan consistent with Common Clinical Best Practices;

  - Reasonably expected to improve the member's mental health/substance use disorder condition(s).

  AND

- The factors leading to admission have been identified and are integrated into the treatment and discharge plans.

  AND

- Clinical best practices are being provided with sufficient intensity to address the member's treatment needs. . . .

  AND

- The member's family and other natural resources are engaged to participate in the member's treatment as clinically indicated and feasible.

  AND

- Treatment is not primarily for the purpose of providing custodial care. Services are custodial when they are any of the following:

  - Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring, and ambulating);

  - Health-related services provided for the primary purpose of meeting the personal needs of the member;

  - Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively.[12]

Relevant to Plaintiffs' Parity Act claim, the Plan also covers medical/surgical treatment at

---

[12] *AR* at 17 (Common Criteria), 29–30 (RTC Continuing Stay Criteria).

skilled nursing facilities and inpatient rehabilitation facilities, if medically necessary.[13]  The parties agree these facilities are analogous to RTCs.[14]  At all relevant times, Defendants used the Milliman Care Guidelines (MCGs) to evaluate the medical necessity of treatment at skilled nursing facilities and inpatient rehabilitation facilities.[15]

## II.   Relevant Medical History[16]

### A.  K.D.'s Childhood

K.D.'s parents adopted her when she was born.[17]  For several years, K.D. was "bright and cheerful," but she started to have "attachment anxiety" when she was four.[18]  For example, K.D. struggled to attend school and often had meltdowns when she got home.[19]  When K.D. continued to struggle despite help from her teacher and school counselor, her parents enrolled her in counseling.[20]

K.D. was a "model student" at school, but it was difficult for her to socialize and develop meaningful relationships.[21]  She continued to have meltdowns at home, and she was given

---

[13] *See Defendants' Motion* ¶¶ 15, 18; *see also AR* at 1709, 1746.

[14] *Plaintiffs' Motion* at 38; *Defendants' Motion* at 26.

[15] *Plaintiffs' Motion* ¶ 54; *Defendants' Motion* ¶ 13.

[16] Defendants argued that many of L.D.'s factual allegations are hearsay and thus improper for summary judgment. *See Defendants' Opposition* at 4–5 (citing Fed. R. Evid. 801(c); *Gibbons v. Hidden Meadow, LLC*, 524 F. App'x 451, 453 (10th Cir. 2013) (unpublished)).  However, factual allegations drawn from the Administrative Record are not improper because "a pension or welfare fund trustee or administrator is not a court, and it is not bound by the rules of evidence."  *Bigley v. CIBER, Inc. Long Term Disability Coverage*, 570 F. App'x 756, 761 (10th Cir. 2014) (unpublished) (brackets omitted) (quoting *Karr v. Nat'l Asbestos Workers Pension Fund*, 150 F.3d 812, 814 (7th Cir. 1998)).  The court thus considers the entire Administrative Record, even though it might otherwise be excluded as hearsay.  *See IHC Health Servs., Inc. v. Intermountain United Food & Com. Workers & Food Indus. Health Fund*, No. 2:16-cv-01157-EJF, 2018 WL 2709213, at *2 (D. Utah June 5, 2018).

[17] *AR* at 330.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

multiple possible diagnoses, including general anxiety disorder, oppositional defiant disorder, and disruptive mood dysregulation disorder.[22]  As K.D. got older, she became more aggressive, particularly towards her parents.[23]  K.D.'s family tried to address this behavior, but nothing seemed to help.[24]  Her parents also met regularly with her school because she said she was being bullied.[25]  Moreover, K.D. often said she would be "better off dead," sometimes screaming it when she had a meltdown.[26]

The summer before K.D. started fifth grade, she started having pseudo-seizures, and a doctor recommended she see a psychiatrist.[27]  K.D. visited a psychiatrist, a neurologist, and a nurse practitioner, and she started taking prescription drugs.[28]

For the next several years, K.D. continued to struggle.  Although she was taking prescription drugs, attending counseling, and had received multiple diagnoses, her parents saw no improvement.[29]  When she was in sixth grade, K.D. "tried to beat [her] mom up and did a good job."[30]  The next day, she told her teacher that her mother hit her, and social services opened an investigation, which they closed after speaking with the family.[31]  After this incident, K.D. began to isolate more and struggled with bullying, particularly online.[32]  One evening, she

---

[22] *AR* at 331.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *AR* at 331–32.

[28] *AR* at 332.

[29] *AR* at 332–34.

[30] *AR* at 332.

[31] *AR* at 332–33.

[32] *AR* at 333.

threated to kill herself, and her parents called a crisis hotline, which sent a team to help K.D. and her family.[33]  On another occasion, K.D.'s parents called the police after K.D. threatened to hurt her family and commit suicide.[34]

When K.D. started middle school, the transition was difficult, and she started to fall behind in classes.[35]  One day, the school called a crisis team because K.D. reported she was suicidal.[36]  K.D.'s parents decided to switch counselors, and K.D. started seeing Dr. Lisa Bravo.[37]  Shortly thereafter, K.D. had such a bad night that she spent a full week in Banner Behavioral Health Hospital.[38]  Banner Behavioral recommended a new psychiatrist, who K.D. start seeing, and she started taking new medications.[39]

In 2018, K.D. had a full psychological evaluation from a new doctor.[40]  His evaluation indicated new diagnoses, including possibly Asperger's syndrome.[41]  Around this time, K.D.'s behavior worsened.[42]  Her parents learned she had been taking "risky photos" of herself and sending them to her online friends.[43]  She also used her grandmother's credit card without permission to buy something "inappropriate" online.[44]  On another occasion, she ran away from

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *AR* at 334.

[40] *Id.*

[41] *Id.*

[42] *See id.*

[43] *Id.*

[44] *Id.*

home, and her parents had to call the police for help finding her.[45]  Overall, K.D. continued to

isolate and be aggressive and defiant.[46]  Her parents worried she would "do something she would

regret or harm a family member."[47]

   In November 2018, K.D. was again hospitalized at Banner Behavioral.[48]  The treating

doctor and Dr. Bravo agreed that K.D. needed a higher level of care, and K.D. was transferred to

Elevations, an RTC.[49]

### B.  K.D.'s Residential Treatment at Elevations

   On December 7, 2018, K.D. was admitted to Elevations, and Dr. Michael Connolly

completed a psychological evaluation.[50]  He noted that K.D. is "a diagnostic dilemma . . . with a

variety of mood-related diagnoses, anxiety-related diagnoses, concern about non-verbal learning

disorder, and autism spectrum."[51]  Additionally, he documented K.D.'s "suicidal and homicidal

threats," "frequent dishonesty," and manipulative behavior.[52]  He also described K.D.'s "self-

mutilatory behaviors . . . , primarily superficial cutting on arms and legs."[53]  During the

evaluation, K.D. claimed not to know why she was there and denied any present thoughts of

suicide or self-harm, but Dr. Connolly observed that denial should be viewed with "distrust"

given her history.[54]

---

[45] Id.; see also id. at 4391–99 (Nov. 18, 2018 police report).

[46] AR at 334.

[47] Id.

[48] Id.

[49] Id.

[50] AR at 4166.

[51] Id.

[52] AR at 4166–67.

[53] AR at 4167.

[54] AR at 4166, 4169.

Elevations created a Master Treatment Plan for K.D.[55]  The Treatment Plan identified a Master Problem List: (1) "Disruptive Mood Dysregulation Disorder," (2) "Unspecified Neurodevelopmental Disorder," (3) "Unspecified Anxiety Disorder," (4) Parent-child relational problem," and (5) "Academic or educational problem."[56]  The Treatment Plan also set goals for K.D., such as reporting "a significant improvement in mood and sense of well[-]being"[57] and achieving "a significant reduction [in] aggressive and/or non-aggressive misbehavior."[58]  Another goal was for K.D. and her family to "agree upon a specific plan to resolve present conflicts/problems" and "guidelines and rules for living within the home together."[59]

While at Elevations, K.D. improved but also had bad days.[60]  Elevations staff made notes of her mood and behavior each day, and Plaintiffs point to the following notes as relevant:

- December 10, 2018: K.D. had a "hard time"—she isolated from others, said she wanted to go home, and claimed not to know why she was at Elevations.[61]  K.D. denied any present thoughts of suicide or self-harm.[62]  K.D. claimed the last time she self-harmed was 7–8 weeks ago, but her therapist noted her self-harm injuries looked more recent.[63]

- December 11, 2018: K.D. informed two staff members she felt unsafe and was considering self-harm.[64]  She also told staff she thought she was sent to Elevations by mistake.[65]  After staff processed with her, she seemed to be in "a good mood,"[66] although

---

[55] *AR* at 2741–2756.  In June 2019, the Treatment Plan was amended to include a diagnosis for Autism Spectrum, Disorder Level 1.  *AR* at 2741.

[56] *AR* at 2741.

[57] *AR* at 2748.

[58] *AR* at 2751.

[59] *AR* at 2754.

[60] *See AR* at 2757–4165 (Elevations shift logs).

[61] *AR* at 4150.

[62] *AR* at 4149.

[63] *Id.*

[64] *AR* at 4146.

[65] *Id.*

[66] *Id.*

she got upset later in the day and slept in the hallway.[67]

- December 29, 2018: In the morning, K.D. "refused programming."[68]  After dinner, she asked to call her mom, but staff told her it was not the day for phone calls.[69]  She began to cry, bang on the door, and try to pick the lock.[70]  She went into her room, where she became hostile and accused staff of being "sadists, murderers, freaks, perverts, etc."[71]  She threatened to harm staff and accused them of "wanting to kill her."[72]  "After more crying, threats, and name calling," K.D. eventually calmed down.[73]  She entered "a dissociative state" and claimed she did not know who or where she was.[74]

- January 6, 2019: A peer accused K.D. of stealing, and K.D. got upset and threw a plant at the wall.[75]  Later in the morning, K.D. sat on her bed, put a blanket around her head, and said, "[H]e's here, he's trying to get in through the window, I'm not safe."[76]  Afterwards, K.D. "seemed to regulate and rejoin programming."[77]

- January 7, 2019: K.D. told her peers she had been seeing a "shadow type figure" that was making her feel unsafe.[78]

- January 8, 2019: Staff found contraband in K.D.'s room—a peer's "missing makeup bag" and "a hard plastic lid with sharp edges."[79]  K.D. met with Dr. Connolly and "minimized issues" but "acknowledged some self-harm urges."[80]

- January 9, 2019: K.D. refused group therapy and isolated herself.[81]  K.D. admitted to harming herself by using her "fingernail to scratch and cut [her] arm."[82]

---

[67] *AR* at 4144.

[68] *AR* at 4073.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *AR* at 4049.

[76] *AR* at 4050.

[77] *Id.*

[78] *AR* at 4048.

[79] *AR* at 4041.

[80] *AR* at 4039.

[81] *AR* at 4037.

[82] *AR* at 4035; *see also AR* at 4034 (nursing note indicating K.D. had "numerous" small abrasions on her left forearm), 4204 (chart dated Jan. 9, 2019, indicating new self-harm).

- January 11, 2019: Although K.D. had a good day in some respects, she asked to take a break during school because she "saw a dark shadow in the classroom."[83]

- January 15, 2019: K.D was placed on a "Special Treatment Plan" due to self-harm and suicidal ideation.[84]  She said she was "not 'safe'" and could not "do it anymore."[85]  The precautions were discontinued on January 30, 2019.[86]

- January 16, 2019: K.D.'s therapist reported K.D. had made "[m]inimal progress" towards identifying the warning signs of anger[87] and had refused programming 90% of the time.[88]  She also noted K.D. struggled with "peer relationships and dealing with intense emotions."[89]

- January 18, 2019: Dr. Connolly noted K.D. was "externaliz[ing] blame on peers to a significant degree, mimicking behavior at home, which was quite devastatingly difficult to manage.  Basically, in an effort to manipulate extrication from the program."[90]

- January 21, 2019: K.D.'s therapist noted K.D. "minimized the ineffective and unsafe behaviors she engages in towards her peers (threatening to hurt them)."[91]

- January 24, 2019: K.D. had a panic attack and hid under a desk.[92]  She refused medication and appeared to have a hallucination.[93]  A peer helped K.D. settle down, and she slept on her bed in the hallway.[94]

- January 25, 2019: K.D. claimed she "saw a figure in the school and appeared to be crying."[95]

- January 26, 2019: In the morning, K.D. was in a good mood and "seemed to communicate well and appropriately" with her peers.[96]  Later, K.D. "had three separate

---

[83] *AR* at 4031.

[84] *AR* at 4014.

[85] *Id.*

[86] *Id.*; *see also AR* at 4327–73 (Precaution Observation Check Sheets from Jan. 14–30, 2019).

[87] *AR* at 2748.

[88] *AR* at 2753.

[89] *AR* at 2749.

[90] *AR* at 3992.

[91] *AR* at 3980.

[92] *AR* at 3961.

[93] *AR* at 3963.

[94] *Id.*

[95] *AR* at 3959.

[96] *AR* at 3955.

episodes where [she] started to cry and curse at peers and staff."[97]  She also tried to self-harm by dropping a weight on herself.[98]

- January 27, 2019: K.D. refused medication, sat in a corner crying, and would not respond to staff.[99]

- January 28, 2019: K.D.'s therapist noted K.D. continued to minimize her attempts to self-harm.[100]

- January 30, 2019: Dr. Connolly met with K.D. and reported she had a "conflicted desire to engage in treatment."[101]  K.D. continued to have suicidal ideation once per day, which she indicated was an improvement because it happened ten times per day when she first arrived at Elevations.[102]  Dr. Connolly also reported K.D. "recently had an escort to time out room due to an attempt to AWOL to commit suicide."[103]

- February 8, 2019: K.D.'s parents came to visit.[104]  It "mostly went well," but they had to leave early because K.D. became emotionally dysregulated.[105]

- February 11, 2019: K.D. refused her medication, saying, "Those meds make me hate myself."[106]

- February 13, 2019: K.D.'s therapist noted K.D. "self-harms" and "continues to struggle with self-hate and defeating thoughts."[107]

- February 27, 2019: Although K.D. did well for most of the day, during dinner, she sat under a table, started shaking, and said a man was trying to kill her.[108]

- February 28, 2019: K.D. had "four superficial lacerations on [her] left inner forearm."[109]

---

[97] *AR* at 3954.

[98] *AR* at 3953.

[99] *AR* at 3949.

[100] *AR* at 3946.

[101] *AR* at 3934.

[102] *Id.*

[103] *Id.*

[104] *AR* at 3903.

[105] *AR* at 3890.

[106] *AR* at 3892.

[107] *AR* at 2752.

[108] *AR* at 3827.

[109] *AR* at 3825.

She stated she engaged in self-harm three days prior.[110]

- March 7, 2019: Staff found contraband in K.D.'s room, but a nurse examined K.D. and found no new signs of self-harm.[111]

- March 13, 2019: K.D.'s therapist noted she still struggles with self-harm but is working on using coping tools.[112]

- March 15, 2019: Staff reported K.D. engaged in new self-harm—there were "approximately 40 superficial lacerations on [her] lower left leg," ranging "from approximately 2–5 cm."[113]  K.D. said she used her fingernails to make the cuts four or five days beforehand.[114]  Dr. Connolly met with K.D., and she "minimized any immediate concerns."[115]  He noted he would "continue to consider medication change."[116]

- March 18, 2019: K.D. had a "rough and emotional day"—she went into a bathroom and sat in a stall on the floor.[117]  Staff found her and saw blood on the walls, and K.D. later told her peers "she read what the words written in blood said," although she later denied reading the words.[118]

- March 25, 2019: Staff found contraband—a sewing needle and pin—in K.D.'s room.[119]  K.D. became agitated and claimed the items were not hers.[120]

- April 20, 2019: Staff found contraband in K.D.'s room, this time a sharp piece of plastic.[121]  K.D. claimed the contraband was not hers and got mad at staff.[122]

- April 30 through August 13, 2019: On at least eleven dates during this time frame, staff

---

[110] *Id.*

[111] *AR* at 3803.

[112] *AR* at 2752.

[113] *AR* at 3761, 4206.

[114] *AR* at 3761.

[115] *AR* at 3760.

[116] *Id.*

[117] *AR* at 3742.

[118] *Id.*  Plaintiffs note it does not appear the blood was from self-harm by K.D.  *Plaintiffs' Motion* at 18 n.80.

[119] *AR* at 3714.

[120] *Id.*

[121] *AR* at 3616.

[122] *Id.*

noted K.D. had no new self-harm.[123]

In contrast, Defendants point out that on many other days, K.D. was happy, open to programming, and engaging appropriately with staff and her peers.[124]  For example, on February 4, 2019, K.D. "seemed to follow program expectations well" and had "a good day overall."[125] And on February 7, K.D. had "an excellent day" and enjoyed visiting with her parents.[126] Defendants also allege K.D. attended several off-campus field trips.[127]  However, K.D. did not attend all field trips identified by Defendants.  Only "eligible" students could attend field trips, and until May 2019, K.D.'s behavior made her ineligible.[128]

When K.D. attended a hiking trip in May 2019, she did an "okay job."[129]  She complained about the hike, and staff later learned she "let a student run off campus without letting staff know."[130]  The next month, K.D. attended a camping trip, and she was "very successful" and "seemed happy."[131]  However, she was unable to attend other field trips that month because of her behavior.[132]  In July, K.D. had more success—she participated in an off-campus mock triathlon and did great on a canoeing trip.[133]  In August, K.D. went on a camping

---

[123] *AR* at 4207–17.

[124] *Defendants' Opposition* at 6–9.

[125] *AR* at 3917.

[126] *AR* at 3904.

[127] *Defendants' Opposition* at 6–9.

[128] *AR* at 4112 (noting K.D. was ineligible for off-campus activities in December 2018), 3885 (noting K.D. was ineligible for off-campus activities in January and February 2019 because she struggled to "follow[] basic expectations"), 3647 (noting K.D. was ineligible for off-campus activities in March 2019 because she was "struggling on the dorms"), 3540 (noting K.D. was ineligible for off-campus activities in April 2019 because although she showed improvement, she struggled with consistency).

[129] *AR* at 3426.

[130] *Id.*

[131] *AR* at 3293.

[132] *AR* at 3295.

[133] *AR* at 3118–19.

trip where she socialized and behaved well, but she chose not to participate in other outings.[134]

## III.   Plaintiffs' Administrative Appeals

K.D. was at Elevations from December 7, 2018, to November 4, 2019.[135]  Defendants

covered K.D.'s treatment at Elevations from December 7, 2018, to February 10, 2019.[136]  On

February 13, 2019, Defendants sent K.D.'s parents a letter informing them coverage was denied

from February 11 onward (First Letter).[137]  In relevant part, the First Letter stated:

> Based on the Optum Level of Care Guidelines for residential, medical necessity is
> not met as of 02/11/2019.  You have had a trial of Residential treatment for over 60
> days.  The current treatment plan does not appear to be getting you any better.  You
> continue to have mood problems and issues with safety that arise from time to time.
> You are unable to tolerate passes with your parents.  It does not appear that you can
> return home with them because you do not get along with them, and the home
> environment would not be safe.  Your needs appear to be primarily custodial.  You
> appear to require long-term placement for structure and supervision and can
> continue your psychiatric care with Intensive Outpatient individual and family
> interventions.  Recovery can continue at a lower level of care.
>
> You could continue care in the Mental Health Intensive Outpatient Program
> setting.[138]

The Intensive Outpatient Program would have provided "at least" six hours of services per week

for K.D.[139]  The purpose of intensive outpatient services is "to monitor and maintain stability,

decreasing moderate signs and symptoms, increase functioning, and assist members with

integrating into community life."[140]

---

[134] *AR* at 3001.

[135] *AR* at 4166; *Complaint* ¶ 4.

[136] *AR* at 1582–1621.

[137] *AR* at 1651.

[138] *AR* at 1651–52.

[139] *AR* at 24.

[140] *Id.*

Plaintiffs appealed Defendants' denial on August 5, 2019.[141]   For this first-level appeal, Plaintiffs submitted a chronological history of K.D.'s medical history, written by K.D.'s parents.[142]   Plaintiffs also included K.D.'s medical records at Elevations from December 7, 2018, to August 1, 2019.[143]   Additionally, Plaintiffs included a letter dated August 4, 2019, from Dr. Bravo.[144]   The letter summarized K.D.'s behavior that led to her stay at Elevations.[145]   It then stated, "Although [K.D.'s] condition has stabilized significantly, staff reports she still has emotional outbursts that require immediate intervention, and has generated several incident reports due to altercations with peers, and has self-harmed (cutting) on 4 documented occasions."[146] The letter concluded by stating K.D. "is participating in the daily milieu and is motivated to return home, yet another indicator that a higher level of intervention was necessary and appropriate."[147]   Dr. Bravo was not K.D.'s physician at Elevations, and there is no indication Dr. Bravo treated K.D. after she entered Elevations.[148]

Defendants denied Plaintiffs' first-level appeal in a letter dated September 6, 2019 (Second Letter).[149]   The Second Letter stated:

> As of date of service 02/11/2019 and forward, [K.D.'s] symptoms appeared to have stabilized to the extent that 24/7 monitoring in a supervised [RTC] was no longer required to avoid risk of harm to self or others.  The why now factors leading to her [RTC] admission appeared to be able at that point to be safely treated in a less intensive setting.  She was noted to be generally cooperative, responsive to staff, medication adherent, and doing better.  She presented minimal acute behavioral

---

[141] *AR* at 2330.

[142] *AR* at 329–35.

[143] *AR* at 520–1574.

[144] *AR* at 514–15.

[145] *AR* at 515.

[146] *Id.*

[147] *Id.*

[148] *See id.*; *see also Defendants' Opposition* at 11.

[149] *AR* at 1671–73.

management challenges.  She did report occasional impulses to self-injure by fingernail scratching, but she had demonstrated the ability to communicate these concerns and to work with staff regarding them.  She was not reporting active intent to harm herself at that time.  Nor was she dangerous to others, or aggressive.  Her remaining Mental Health symptoms did not appear to impact her ability to effectively participate in treatment programming.  She was able to understand and participate in school and therapeutic programming.  She was engaged and generally using coping skills consistent with her development.  She was able to go on passes, and was taken off campus for hikes, rock climbing, skiing and other activities.  Sleeping, eating, and self care were adequate.  She had no co-occurring medical or substance abuse complications that would need more 24-hour care.  Her parents were supportive, involved and engaged.  She no longer appeared to need the frequent reassessment, frequent change of treatment plan, and daily 24 hour interaction with staff of [an RTC].  Her overall care could have continued at that point in a non 24 hour Partial Hospitalization or Intensive Outpatient setting, preferably near home, with individual therapy, family work and med management along with relevant school adjustments.  This would have helped to monitor and maintain her stability, continue to increase her functioning, develop a support system and further strengthen key relationships with friends and treatment professionals, while integrating her back into family and community life.[150]

On November 1, 2019, Plaintiffs submitted a letter requesting "a level two member appeal regarding United's adverse benefit determination" for all services "from February 11, 2019, through [K.D.'s] future date of discharge."[151]  Attached to the letter was the information provided in the first-level appeal as well updated medical records extending to October 31, 2019.[152]  Defendants responded to this letter on December 2, 2019, informing Plaintiffs that a request for review must include "a clearly expressed desire for reconsideration along with an explanation of why you believe [United's] determination was incorrect."[153]  The letter also requested additional information.[154]  On December 17, 2019, L.D. called to provide additional

---

[150] *AR* at 1671–72.

[151] *AR* at 2311.

[152] *AR* at 2737.

[153] *AR* at 2118 (emphasis omitted).

[154] *Id.*

information and was informed the request was incomplete because of missing information.[155] There is no indication in the record that Plaintiffs continued to pursue this level-two appeal.

On April 14, 2020, Defendants sent a corrected letter to Plaintiffs (Corrected Letter).[156] The physician who wrote the Corrected Letter stated he had "completed an appeal/grievance review on a request [United] received 08/07/2019."[157] The Corrected Letter's substance is mostly identical to the Second Letter, with few minor and seemingly immaterial differences.[158] Both letters state they are a denial of coverage "through 08/06/2019."[159] Plaintiffs "interpret[] this letter to be Defendants' final denial letter in response to Plaintiff's second-level appeal."[160] Defendants dispute this characterization.[161]

## PROCEDURAL HISTORY

Plaintiffs initiated this action on September 1, 2021.[162] In their Complaint, Plaintiffs assert two causes of action: a claim for recovery of benefits under 29 U.S.C. § 1132(a)(1)(B) and a claim for violation of the Mental Health Parity and Addiction Equity Act (Parity Act) under 29 U.S.C. § 1132(a)(3).[163] The parties each submitted and fully briefed a Motion for Summary

---

[155] *AR* at 172–73.

[156] *AR* at 2091–93.

[157] *AR* at 2091.

[158] *Compare AR* at 1671–73, *with AR* at 2091–93.

[159] *AR* at 1672, 2092. The First, Second, and Corrected Letters all state coverage is denied as of February 11, 2019. *AR* at 1651, 1671, 2091. The Second and Corrected Letters also state coverage is denied "02/13/2019 through 08/06/2019." *AR* at 1672, 2092. Because the parties do not dispute coverage was denied on February 11, the reference to February 13 in the Second and Corrected Letters appears to be a mistake. *Plaintiffs' Motion* ¶¶ 34–35; *Defendants' Motion* ¶ 33; *see also AR* at 1622.

[160] *Plaintiffs' Motion* at 24.

[161] *Defendants' Opposition* at 12–13.

[162] *Complaint* at 16.

[163] *Id.* ¶¶ 37–60.

Judgment,[164] and the court heard oral argument on the Motions on July 18, 2023.[165]  The

Motions are now ripe for review.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and" it "is entitled to judgment as a matter of law."[166]  The moving party

bears "the burden of showing beyond a reasonable doubt that it is entitled to summary

judgment."[167]  However, the initial burden varies depending on whether the moving party bears

the burden at trial.

Even when "the moving party does not have the ultimate burden of persuasion at trial, it

has both the initial burden of production . . . and the burden of establishing that summary

judgment is appropriate as a matter of law."[168]  It may "carry its initial burden either by

producing affirmative evidence negating an essential element of the nonmoving party's claim, or

by showing that the nonmoving party does not have enough evidence to carry its burden of

persuasion at trial."[169]  If the moving party fails to carry its initial burden, then "the nonmoving

party may defeat the motion for summary judgment without producing anything."[170]

A "more stringent summary judgment standard applies" when the moving party has the

---

[164] *Plaintiffs' Motion*; *Defendants' Opposition*; ECF 53, *Reply in Support of Plaintiffs' Motion for Summary Judgment*; *Defendants' Motion*; *Plaintiffs' Opposition*; ECF 52, *Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment*; ECF 55, *Plaintiffs' Notice of Supplemental Authority*; ECF 56, *Defendants' Response to Plaintiffs' Notice of Supplemental Authority*.

[165] ECF 63, *July 18, 2023 Minute Entry*.

[166] Fed. R. Civ. P. 56(a).

[167] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (quoting *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991)).

[168] *Id.*

[169] *Id.*

[170] *Id.* (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000)).

burden at trial.[171]  In that circumstance, "the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."[172]

Typically, courts "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[173]  But in an ERISA case like this one where both parties move for summary judgment, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[174]  Additionally, "[c]ross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[175]

## ANALYSIS

Plaintiffs asserted two causes of action: (1) a claim for recovery of benefits under ERISA and (2) a claim for violation of the Parity Act.[176]  Both parties moved for summary judgment on the two claims.  The court addresses each claim in turn.

### I.    Denial of Benefits Claim

The court will first outline the standard of review applicable to this claim.  It will then address the merits.

---

[171] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

[172] *Id.*

[173] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[174] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010).

[175] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[176] *Complaint* ¶¶ 37–60.

### A.  Standard of Review

"ERISA authorizes a judicial action challenging an administrative denial of benefits but does not specify the standard of review that courts should apply."[177]  The Supreme Court held de novo review applies "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[178]  Generally, if the plan gives the administrator discretionary authority, courts "employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[179]

The parties here agree de novo review is appropriate, so the court reviews Defendants' denial of benefits de novo.[180]  "When applying a de novo standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision.  The administrator's decision is accorded no deference or presumption of correctness,"[181] but the court "will consider only 'those rationales that were specifically articulated in the administrative record as the basis for denying a claim.'"[182]  The "standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision; it

---

[177] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009).

[178] *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 115 (1989).

[179] *LaAsmar*, 605 F.3d at 796 (quoting *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)).

[180] *Defendants' Opposition* at 21 ("United agrees that the *de novo* standard applies here."); *see also Carlile v. Reliance Standard Ins. Co.*, 385 F. Supp. 3d 1180, 1185 (D. Utah 2019) (reviewing a benefits denial de novo when the parties agreed on de novo review).  Although Plaintiffs originally argued Defendants' decision was arbitrary and capricious, they later agreed with Defendants that de novo review applies.  *Compare Plaintiffs' Motion* at 29, *with Plaintiffs' Reply* at 8.

[181] *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (quoting *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)).

[182] *Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review."[183]

Although Plaintiffs agree that de novo review is appropriate, they also argue the court "should consider the brief and cursory nature of Defendants' denial letters, the inconsistencies between them, and Defendants' failures to appropriately engage with information Plaintiff provided to Defendants when considering how much weight and credibility to afford Defendants' denial rationale."[184]  Because the court is reviewing the denial de novo, it grants the denial letters no deference and thus does not afford them any weight or credibility.[185]

Nevertheless, Plaintiffs further contend Defendants did not fully and fairly review their claims and "the procedural irregularities are relevant to whether the information and arguments in the prelitigation appeal record reveal that the preponderance of the evidence weighs in favor of payment of benefits."[186]  The Tenth Circuit has indicated ERISA claimants may challenge a denial of benefits procedurally, raising a full-and-fair review argument that is separate from an argument challenging the merits of a denial.[187]  However, the court is not persuaded Plaintiffs have made such an argument—they framed their full-and-fair review argument as a reason for ruling in their favor on the merits, not as a separate basis for reversal.[188]  Accordingly, the court

---

[183] *Niles*, 269 F. App'x at 833.

[184] *Plaintiffs' Reply* at 9.

[185] *Niles*, 269 F. App'x at 832.

[186] *Plaintiffs' Reply* at 9–10.

[187] *See, e.g.*, *Niles*, 269 F. App'x at 833 ("A showing that the administrator failed to follow ERISA procedures therefore provides a basis for reversal separate from that provided by de novo review of the merits of the claim.").

[188] *See id.* (evaluating "procedurally-based arguments" that the claimant "presented separately from her argument targeting the *merits*" of a denial).

will not consider whether the alleged "procedural shortcomings" denied Plaintiffs a full and fair review.[189]

### B. Merits

Defendants denied coverage because they determined RTC services were no longer medically necessary.[190]  Essentially, they determined K.D.'s behavioral problems had stabilized, she was not improving, and she did not need 24-hour care.[191]  The court considers this determination below with respect to three different time frames.  It concludes Plaintiffs have shown by a preponderance of the evidence that RTC services were medically necessary from February 11 to March 15, 2019.  It then concludes Plaintiffs have not met their burden for March 16 to August 6, 2019.  Finally, it concludes remand is appropriate for the claim from August 7 to November 4, 2019.

### 1. Plaintiffs Are Entitled to Benefits from February 11 – March 15, 2019.

Plaintiffs contend a preponderance of the evidence indicates K.D.'s treatment at Elevations was medically necessary from February 11 to March 15, 2019.[192]  The court agrees.

K.D. was admitted to Elevations because of her behavioral and mood problems, including suicidal threats, self-harm, physical violence, and manipulative behavior.[193]  A preponderance of the evidence shows these behaviors had not stabilized by February 11 and that although K.D.

---

[189] At oral argument, Defendants urged the court to consider *D.K. v. United Behavioral Health*, 67 F.4th 1224 (10th Cir. 2023).  In *D.K.*, the Tenth Circuit discussed the need for a "full and fair review," but it did so while conducting an arbitrary and capricious review.  *See id.* at 1242.  The court here is reviewing the denial of benefits de novo, so it is not persuaded that *D.K.* dictates the outcome of this case.

[190] *AR* at 1651, 1671–72, 2091–92.

[191] *AR* at 1651–52, 1671–72, 2091–92; *see also Defendants' Motion* at 18 ("Both reviewers noted that there had been improvements and there was no suicidal or homicidal ideation or self-harming behaviors and K.D. no longer needed the frequent reassessment, change in treatment plan, or daily 24 hour interaction with staff required by a RTC.").

[192] *Plaintiffs' Reply* at 10–15; *Plaintiffs' Opposition* at 4–11.

[193] *See AR* at 4166 (Elevations RTC Psychiatric Evaluation/Admitting Note: Admission Criteria).

was improving, she still required 24-hour care.  For example, K.D. continued to self-harm.  Two weeks before Defendants denied coverage, K.D. refused medication, minimized her attempts to self-harm, and had daily suicidal ideations.[194]  On February 13, two days after the denial, K.D.'s therapist noted she "self-harms" and "continues to struggle with self-hate and defeating thoughts."[195]  On February 28, K.D. admitted to self-harming three days prior and had "four superficial lacerations" on her arm.[196]  In early March, K.D.'s therapist noted she continued to struggle with self-harm and was working on coping skills.[197]  And on March 15, staff found new self-harm—"approximately 40 superficial lacerations on [K.D.'s] lower left leg," ranging "from approximately 2–5 cm."[198]  K.D. admitted to making the cuts with her fingernails, but she also "minimized any immediate concerns."[199]

K.D. had other struggles.  When her parents visited on February 8, things went "mostly well" until K.D. became emotionally dysregulated, causing her parents to leave early.[200]  Later in February, K.D. had a good day, but during dinner she sat under a table, started shaking, and claimed a man was trying to kill her.[201]  Moreover, in February and March 2019, K.D. was ineligible to attend off-campus activities because she struggled to "follow[] basic expectations" and was "struggling on the dorms."[202]

---

[194] *AR* at 3934, 3946, 3949.

[195] *AR* at 2752.

[196] *AR* at 3825.

[197] *AR* at 2752.

[198] *AR* at 3761, 4206.

[199] *AR* at 3760–61.

[200] *AR* at 3890.

[201] *AR* at 3827.

[202] *AR* at 3647, 3885.

Nevertheless, Defendants argue RTC services were no longer medically necessary because the factors that led to K.D.'s admission had been addressed, she was no longer improving, and 24-hour care was no longer necessary.[203]  They point out that on March 15—the day staff found "approximately 40 superficial lacerations on [K.D.'s] lower left leg"—K.D. was "struggling with feelings of self-harm" but was able to calm down after processing with staff and peers.[204]  Moreover, although K.D. thought a man was trying to kill her, she recovered, was "ok the rest of the night," and "seemed engaged."[205]  Defendants also highlight that on March 13, staff reported K.D. was participating in programming "90–95% of the time."[206]  Additionally, Defendants cite several dates where staff reported K.D. was "happy," "productive," "engaged," and otherwise doing well.[207]  They also emphasize the off-campus activities Elevations organized.[208]  Defendants argue this evidence is more compelling and indicates the incidents Plaintiffs rely on are "isolated."[209]

There is evidence K.D. improved and was engaging in programming.  But Plaintiffs need only show medical necessity by a preponderance of the evidence, and the evidence is sufficient to satisfy that burden.  On February 28 and March 15, staff reported that K.D. had engaged in new self-harm, indicating the symptoms that led to admission had not stabilized.[210]  And although K.D. was able to calm down and process her desire to self-harm on March 15,[211] K.D.'s

---

[203] *Defendants' Opposition* at 18–19; *AR* at 16–17 (identifying the common admission and continuing-stay criteria).

[204] *AR* at 3761–62.

[205] *AR* at 3827.

[206] *AR* at 2753.

[207] *Defendants' Reply* at 5–6 (citing *AR* at 3886, 3878, 3845, 3836, 3826, 3817, 3763).

[208] *Id.* at 6.

[209] *Id.* at 7.

[210] *See AR* at 3760–61, 3825.

[211] *AR* at 3762.

treating physician at Elevations noted K.D. "minimized any immediate concerns but continues to periodically self-harm."[212]  Moreover, evidence that K.D. was implementing coping skills, attending programming, and having good days supports a determination that K.D. was improving, contrary to Defendants' contention that she was no longer improving.  Furthermore, evidence that K.D. had good days does not disprove medical necessity—before February 11, K.D. had days where she was "in a good mood," "joking around" with peers, and following expectations, yet Defendants do not dispute RTC services were medically necessary during that time.[213]  Finally, although Defendants emphasize that K.D. participated in off-campus activities in February and March 2019, she did not.[214]  K.D. was ineligible for off-campus activities during those months, further indicating her symptoms had not stabilized and she needed 24-hour care.

Defendants argue an additional factor undermines medical necessity: "multiple reviewers found lack of medical necessity."[215]  In support of this argument, they cite *Tracy O. v. Anthem Blue Cross Life & Health Insurance Co.*,[216] *Mary D. v. Anthem Blue Cross Blue Shield*,[217] and *Anne M. v. United Behavioral Health*.[218]  But the court is not persuaded that these cases stand for the proposition that a district court applying de novo review should credit reviewers' decisions.

In *Tracy O.*, the district court applied arbitrary and capricious review, but stated it would have reached the same conclusion under de novo review.[219]  In doing so, the court referenced

---

[212] *AR* at 3760.

[213] *Id.* at 3904, 3917, 3928, 3941; *see also Defendants' Reply* at 6 n.24 ("Defendants do not dispute that K.D. needed RTC between January 30 and February 10, 2019.").

[214] *Defendants' Reply* at 6; *AR* at 3647, 3885.

[215] *Defendants' Reply* at 9; *see also Defendants' Motion* at 24.

[216] No. 2:16-cv-422-DB, 2017 WL 3437672 (D. Utah Aug. 10, 2017).

[217] 778 F. App'x 580 (10th Cir. 2019) (unpublished).

[218] No. 2:18-cv-808, 2022 WL 3576275 (D. Utah Aug. 19, 2022).

[219] 2017 WL 3437672, at *8–9.

submissions from the plaintiffs' treating physicians, but did not seem to credit the medical reviewers' opinions.[220]  Similarly, in *Mary D.*, the Tenth Circuit affirmed a district court's decision to apply arbitrary and capricious review but explained the outcome would have been the same under de novo review.[221]  When explaining why benefits would have been denied under de novo review, the Circuit referenced medical reviewers' opinions.[222]  However, the plaintiffs had argued the administrator should have deferred to their treating physicians, and the Circuit seemed to reference the medical reviewers' opinions as a way of demonstrating the outcome would have been the same "whether [it] credit[ed] the treating physicians or the medical reviewers."[223] And in *Anne M.*, the court first reviewed the administrative record de novo and concluded plaintiffs had not met their burden, and then explained the reviewers "reached [the] same conclusion."[224]  Accordingly, the court is not persuaded these cases stand for the proposition that under de novo review, a court should weigh medical reviewers' opinions when deciding if the plaintiff has met its burden.  And regardless, under de novo review, "[t]he administrator's decision is accorded no deference or presumption of correctness."[225]

Even so, the medical reviewers' opinions would not help Defendants' position for two key reasons.  First, the Second and Corrected Letters do not acknowledge K.D.'s self-harm after February 10, 2019.[226]  Second, although the Letters consistently state 24-hour care was no longer

---

[220] *Id.* at *9.

[221] 778 F. App'x at 592.

[222] *Id.* at 594.

[223] *Id.*

[224] 2022 WL 3576275, at *8–9.

[225] *Niles*, 269 F. App'x at 832 (quoting *Hoover*, 290 F.3d at 809).

[226] *AR* at 1671–72, 2091–93.  The Second and Corrected Letters acknowledge "occasional impulses to self-injure by fingernail scratching" but do not acknowledge K.D. actually self-harmed after February 10.  *See id.*

essential, there are some inconsistencies. The First Letter stated treatment did "not appear to be getting [K.D.] any better," identified problems with K.D.'s mood, and concluded K.D. could not return home with her parents because she did "not get along with them" and it would be unsafe.[227] It then abruptly stated K.D. could "continue [her] psychiatric care with Intensive Outpatient individual and family interventions. Recovery can continue at a lower level of care."[228] Although the Letters all reached the same outcome, the First Letter has some internal inconsistencies and some inconsistencies with the Second and Corrected Letters. While the court would not normally consider these inconsistencies under de novo review, Defendants have asked it to consider the Letters. Even considering them, the court still concludes Plaintiffs have satisfied their burden.[229]

In sum, Plaintiffs have demonstrated by a preponderance of the evidence that from February 11 to March 15, 2019, K.D.'s stay at Elevations was medically necessary because although she was improving, her symptoms had not stabilized to the point she no longer needed 24-hour care.

The court must next decide the appropriate remedy. Defendants argue that if the court determines benefits are available, it should remand "because the record is far from clear-cut."[230] The court disagrees. The record contains K.D.'s medical records through March 15, 2019, and

---

[227] *AR* at 1651–52.

[228] *AR* at 1652.

[229] To be clear, the Letters consistently stated coverage was denied because RTC care was no longer necessary, and the court's review is properly limited to determining whether that decision was correct. *See Mike G. v. Bluecross Blueshield of Tex.*, No 2:17-cv-347-TS, 2019 WL 2357380, at *13 (D. Utah June 4, 2019); *Christine S. v. Blue Cross Blue Shield of N.M.*, No. 2:18-cv-00874-JNP-DBP, 2021 WL 4805136, at *1 n.1 (D. Utah Oct. 14, 2021). The court's conclusion that Plaintiffs are entitled to benefits from February 11 to March 15, 2019, is not based on the identified inconsistencies, and the court notes the inconsistencies only to help explain why it will not defer to the Letters.

[230] *Defendants' Opposition* at 33.

Defendants do not explain what other evidence is relevant.  Indeed, Defendants' arguments regarding the insufficiency of the record seem limited to the time frame after August 6, 2019.[231] Remand is thus unnecessary, and the court orders Defendants to pay for K.D.'s treatment at Elevations from February 11 to March 15, 2019.

### 2.  Plaintiffs Are Not Entitled to Benefits from March 16 – August 6, 2019.

Plaintiffs also contend a preponderance of the evidence indicates K.D.'s treatment at Elevations was medically necessary from March 16 to August 1, 2019.[232]  The court disagrees.

The record contains no evidence that K.D. participated in self-harm from March 16 to August 13, 2019.[233]  Indeed, on eleven dates from April 30 to August 13, Elevations staff recorded no new self-harm.[234]  K.D. also progressed enough to participate in off-campus trips— she attended a hiking trip in May 2019[235] and a camping trip in June 2019.[236]  Staff noted K.D. was "very successful" on the camping trip and "seemed happy and content."[237]  In July 2019, K.D. participated in a mock triathlon and a canoeing trip.[238]  There were also numerous days where staff noted K.D. was doing well overall.[239]

---

[231] *See id.* (explaining "the final appeal only included a review of claims and medical records through August 6, 2019").

[232] *Plaintiffs' Reply* at 10–12; *Plaintiffs' Opposition* at 4–11.  Although Plaintiffs limit this time frame to August 1, 2019, Defendants' denied benefits through August 6, 2019.  *See AR* at 1672, 2092.

[233] *See AR* at 4207–17; *see also Plaintiffs' Motion* at 19.

[234] *AR* at 4207–17.

[235] *AR* at 3426.

[236] *AR* at 3293.

[237] *Id.*

[238] *AR* at 3118–19.

[239] *See, e.g., AR* at 3585 (noting K.D. had "a good day"), 3654 (noting K.D. "seemed to have a great day"), 3699 (noting K.D. "appeared to be in a good mood").

To be sure, K.D. still had struggles—for example, staff found contraband in her room on two occasions, although there was no accompanying self-harm.[240]  K.D. also had one "rough and emotional day" where she sat in a bathroom stall that had blood on the walls.[241]  On other occasions, K.D. reacted negatively when corrected by staff or peers.[242]  And while on the May 2019 hiking trip, she allowed another student to run off without letting staff know.[243]

K.D.'s ongoing behavioral problems may indicate she needed additional treatment.  But they do not demonstrate by a preponderance of the evidence that K.D. needed 24-hour care. K.D. had no self-harm for almost five months and successfully participated in off-campus activities, demonstrating K.D.'s symptoms had stabilized and she no longer required 24-hour care.  Nevertheless, Plaintiffs contend a letter from Dr. Bravo—K.D.'s psychotherapist before she entered Elevations—demonstrates medical necessity.[244]  But there is no indication in the record that Dr. Bravo treated K.D. after she was admitted to Elevations, nor is there any indication Dr. Bravo considered the requirements for medical necessity under the Plan.[245]  The letter is also largely historical—it recounts the events leading to K.D.'s admission to Elevations and then refers generally to some of K.D.'s behavioral problems at Elevations.[246]  And while the letter might suggest Dr. Bravo recommended K.D. stay at Elevations, it does not state continuing

---

[240] *AR* at 3616, 3714.

[241] *AR* at 3742.

[242] *See, e.g.*, *AR* at 3699 (noting K.D. ignored staff when they "called [her] out" for negative behavior), 3724 (noting K.D. "sometimes appears disrespectful to staff").

[243] *AR* at 3426.

[244] *Plaintiffs' Motion* at 43; *Plaintiffs' Reply* at 19.

[245] *AR* at 515 (Dr. Bravo's Aug. 2019 Letter).

[246] *Id.*

RTC services were medically necessary.[247]  Consequently, Dr. Bravo's letter does not help Plaintiffs carry their burden.

For these reasons, Plaintiffs have not demonstrated by a preponderance of the evidence that RTC services were medically necessary from March 16 to August 6, 2019.  Defendants' denial of benefits for this period is upheld.

### 3.  Remand is appropriate for claims from August 7 to November 4, 2019.

Plaintiffs contend "the record is not developed enough to support a reversal with an order to pay benefits [] for the time frame after August 1, 2019, [and] additional review of the medical necessity of treatment is appropriate."[248]  For the reasons explained below, the court concludes remand is appropriate for the claims from August 7 to November 4, 2019.

When courts review a denial of coverage, they consider the "rationales that were specifically articulated in the administrative record as the basis for denying a claim."[249]  Here, the First, Second, and Corrected Letters articulate Defendants' reasoning for denying Plaintiffs' claims.[250]  The First Letter states coverage is denied "02/11/2019 forward," but it was issued in February 2019, before Defendants could have articulated a reason for denying coverage from August 2019 onward.[251]  The Second and Corrected Letters were issued in September 2019 and April 2020, respectively, but they state coverage is denied "through 08/06/2019."[252]

---

[247] *Id.*

[248] *Plaintiffs' Reply* at 19; *see also Plaintiffs' Motion* at 43 (arguing remand is appropriate for the claims after August 1, but under the arbitrary and capricious standard of review).

[249] *Spradley*, 686 F.3d at 1140 (quotation simplified).

[250] *See AR* at 1651–53, 1671–73, 2091–93.

[251] *AR* at 1651.

[252] *AR* at 1671–72, 2091–92.

Accordingly, any rationale given in the First, Second, and Corrected Letters applies only to claims before August 7, 2019.

Plaintiffs appear to disagree because they "interpret[]" the Corrected Letter as "Defendants' final denial letter in response to Plaintiff's second-level appeal."[253]  Although Plaintiffs submitted a letter requesting "a level two member appeal regarding United's adverse benefit determination" for all services "from February 11, 2019, through [K.D.'s] future date of discharge,"[254] they were informed the request was incomplete because of missing information.[255] And as Defendants point out, there is no record evidence indicating Plaintiffs pursued this appeal.[256]  Furthermore, the Corrected Letter stated the reviewer had "completed an appeal/grievance review on a request we received 08/07/2019."[257]  So it is most likely this was referring to Plaintiffs' first appeal, which they submitted on August 5, 2019.[258]

For these reasons, the court will not construe the rationales in the First, Second, and Corrected Letters as applying to claims after August 6, 2019.[259]  There is thus no rationale for the court to review for this final time frame.  "[I]f the plan administrator failed to make adequate findings or to explain adequately the grounds of its decision, the proper remedy is to remand the

---

[253] *Plaintiffs' Motion* at 24 n.105.

[254] *AR* at 2311.

[255] *AR* at 172–73.

[256] *Defendants' Opposition* at 12–13.

[257] *AR* at 2091.

[258] *AR* at 2330.

[259] Plaintiffs contend remand is appropriate for the claims after August 1, 2019, likely because their first-level appeal included medical records through August 1, 2019, only.  *See Plaintiffs' Reply* at 19; *AR* at 520–1574, 2330. However, the rationale given in the Second and Corrected Letters clearly applies through August 6, 2019, and K.D.'s medical records through October 2019 are in the record, so the court has sufficient evidence to determine if the denial was correct through August 6, 2019.

case to the administrator for further findings or explanation."[260]  The court concludes there are

no grounds for United's decision in the record, as opposed to concluding it failed to adequately

explain the grounds, but remand is still appropriate.[261]  The administrative record is incomplete,

placing the court in a "poor position" to review Defendants' denial of coverage after August 6,

2019.[262]  And even though K.D.'s medical records through October 2019 are in the record and

the court could review them, such a review would require the court to function as a substitute

plan administrator, something the Tenth Circuit has discouraged.[263]

   The court acknowledges this scenario is unusual and potentially implicates exhaustion

requirements.[264]  However, Defendants have not argued Plaintiffs failed to exhaust their

administrative remedies.[265]  And although the Tenth Circuit has not addressed the issue, several

circuits have concluded administrative exhaustion is not a jurisdictional requirement in ERISA

cases.[266]  Additionally, the Tenth Circuit has held district courts may waive exhaustion under

---

[260] *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006) (quotation simplified).  Although cases discussing remand usually involve a determination that the administrator acted arbitrarily and capriciously, the Tenth Circuit has clarified that "the underlying rationale supporting a remand versus a reinstatement of rights is applicable" to de novo review.  *Ray v. UNUM Life Ins. Co. of Am.*, 224 F. App'x 772, 780 n.3 (10th Cir. 2007) (unpublished); *see also Brian J. v. United Healthcare Ins. Co.*, 4:21-cv-42, 2023 WL 2743097, at *8 (D. Utah Mar. 31, 2023) (remanding after reviewing administrator's denial de novo).

[261] *See M.Z. v. Blue Cross Blue Shield of Ill.*, No. 1:20-cv-00184-RJS-CMR, 2023 WL 2634240, at *15 (D. Utah Mar. 24, 2023) ("In cases where the administrative process is interrupted midstream due to unintentional procedural irregularities rather than the parties' conduct, leaving an incomplete and inconclusive administrative record, remand is the best option to allow for a benefits determination on the merits and to create a complete record for judicial review.").

[262] *Id.* at *16.

[263] *See Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007).

[264] "Although ERISA contains no explicit exhaustion requirement, courts have uniformly required that participants exhaust internal claim review procedures provided by the plan before bringing a civil action."  *Holmes v. Colo. Coal. for Homeless Long Term Disability Plan*, 762 F.3d 1195, 1203 (10th Cir. 2014).

[265] *See generally Defendants' Opposition*; *Defendants' Motion*; *Defendants' Reply*.

[266] *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 n.2 (9th Cir. 2008); *Crowell v. Shell Oil Co.*, 541 F.3d 295, 308–09 (5th Cir. 2008); *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 279–80 (3d Cir. 2007); *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 446 (2d Cir. 2006).

limited circumstances in ERISA cases, indicating exhaustion is not a jurisdictional requirement.[267]  The court thus declines to consider exhaustion sua sponte.

For the reasons stated, the court remands for Defendants to provide a specific rationale explaining why RTC coverage was denied from August 7 to November 4, 2019.[268]

## II.  Parity Act Claim

The Parity Act applies to group health plans that provide medical/surgical benefits and mental health or substance use disorder benefits.[269]  Under the Act, treatment limitations applicable to mental health benefits may not be more "more restrictive than the predominant treatment limitations applied to substantially all" medical/surgical benefits.[270]

Plaintiffs assert Defendants violated the Parity Act because they apply the "medically necessary" treatment limitation more restrictively for mental health benefits than for medical/surgical benefits.[271]  To establish a Parity Act violation, Plaintiffs must show

> (1) the relevant group health plan is subject to the Parity Act; (2) the plan provides both medical/surgical benefits and mental health or substance use disorder benefits; (3) the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and (4) the mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared.[272]

---

[267] *See McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1263 (10th Cir. 1998).

[268] The administrative record does not include K.D.'s medical records for this entire period.  *See AR* at 2737.

[269] 29 U.S.C. § 1185a(a)(3)(A).

[270] *Id.* § 1185a(a)(3)(A)(ii).

[271] *See Complaint* ¶ 47; *see also Plaintiffs' Motion* at 36–42.  Defendants argue Plaintiffs relied on a different theory of liability in their Motion for Summary Judgment than in their Complaint.  *Defendants' Reply* at 10.  While there are differences, Plaintiffs' Complaint asserted a Parity Act claim based on the medical necessity treatment limitation.  *See Complaint* ¶¶ 43–59.  Under the liberal pleading standards, this was sufficient.  *See* Fed. R. Civ. P. 8(a)(2).

[272] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1028 (D. Utah 2021) (quotation simplified).  "While the Tenth Circuit has not spoken on what is required to state a claim under the Parity Act, courts in this district typically apply either a three- or four-part test to analyze claims."  *M.Z. v. Blue Cross Blue Shield of Ill.*, No. 1:20-cv-00184-RJS-CMR, 2023 WL 2634240, at *17 (D. Utah Mar. 24, 2023).  Plaintiffs cite the four-part test, and Defendants do not object, so for this case, the court uses the four-part test.  *See Plaintiffs' Motion* at 36–37.

The parties do not dispute that the Plan is subject to the Parity Act and provides mental health and medical/surgical benefits.  Moreover, they agree that skilled nursing facilities and inpatient rehabilitation facilities are medical/surgical analogues to RTCs.[273]  However, the third element is disputed.  The court must thus determine whether the Plan's medical necessity limitation applicable to mental health benefits is more restrictive than the limitation applicable to medical/surgical benefits.[274]  In doing so, the court "affords no deference" to the benefits administrator and instead examines "'the plan documents as a whole' to determine whether" there is a violation.[275]  For the reasons explained below, Plaintiffs have not presented sufficient evidence of a violation, and Defendants are entitled to summary judgment on this claim.

The medical necessity limitation is nonquantitative,[276] so it complies with the Parity Act if

> any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.[277]

---

[273] *Plaintiffs' Motion* at 38; *Defendants' Motion* at 26.

[274] 29 U.S.C. § 1185a(a)(3)(A).  Challenges under the Parity Act can "be either *facial* (as written in the language or the processes of the plan) or *as-applied* (in operation via application of the plan)."  *Jeff N. v. United HealthCare Ins. Co.*, 2:18-cv-00710-DN-CMR, 2019 WL 4736920, at *3 (D. Utah Sept. 27, 2019).  Plaintiffs contend "Defendants committed 'as applied'" violations, but Defendants argue Plaintiffs' claim "is nothing more than a facial challenge" because they do not challenge the application of the LOC Guidelines.  *See Plaintiffs' Motion* at 38; *Defendants' Motion* at 36.  The court does not resolve whether Plaintiffs have technically alleged a facial or as-applied challenge because they have not met their burden under either framework.

[275] *M.Z.*, 2023 WL 2634240, at *17 (quoting *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008)).

[276] Federal regulations identify two types of treatment limitations—quantitative and nonquantitative.  29 C.F.R. § 2590.712(a).  Nonquantitative limitations "limit the scope or duration of benefits for treatment."  *Id.*

[277] 45 C.F.R. § 146.136(c)(4)(i).

Applied here, there is no Parity Act violation if the Plan applies the medical necessity limitation to mental health treatment using "processes, strategies, evidentiary standards, or other factors" that are comparable to and not more stringent than the "processes, strategies, evidentiary standards, or other factors" used for applying the limitation to medical/surgical benefits. The court concludes the "processes, strategies, evidentiary standards, or other factors" are comparable for three reasons.

First, the Plan defines "medically necessary" the same for both mental health and medical/surgical treatment. Under the Plan, medically necessary is defined as

- In accordance with *Generally Accepted Standards of Medical Practice.*
- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance-related and addictive disorders, disease or its symptoms.
- Not mainly for your convenience or that of your doctor or other health care provider.
- Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.[278]

The Plan thus applies an identical medical necessity limitation to both mental health benefits and medical/surgical benefits.[279]

Second, the guidelines Defendants used for applying the medical necessity limitation to mental health treatment and medical/surgical treatment were developed using similar processes. The federal regulations provide this relevant example:

A plan generally covers medically appropriate treatments. For both medical/surgical benefits and mental health and substance use disorder benefits, evidentiary standards used in determining whether a treatment is medically appropriate (such as the number of visits or days of coverage) are based on recommendations made by panels of experts with appropriate training and

---

[278] *AR* at 1802.

[279] *See id.*

experience in the fields of medicine involved.  The evidentiary standards are applied in a manner that is based on clinically appropriate standards of care for a condition.[280]

In this example, there is no violation "because the processes for developing the evidentiary standards used to determine medical appropriateness and the application of these standards to mental health and substance use disorder benefits are comparable to and are applied no more stringently than for medical/surgical benefits."[281]  This is true "even if the application of the evidentiary standards does not result in similar numbers of visits, days of coverage, or other benefits utilized for mental health conditions . . . as it does for any particular medical/surgical condition."[282]

The Plan uses LOC Guidelines to determine the medical necessity of RTC services.[283] United developed the LOC Guidelines using a "hierarchy of clinical evidence"[284] and included a list of references.[285]  For medical/surgical treatment at a skilled nursing facility or inpatient rehabilitation facility, the Plan uses MCGs to determine medical necessity.[286]  The MCGs are developed by MCG Health and "based solely upon published medical evidence, clinical expertise, and objective, standardized analysis of various databases."[287]  MCG Health uses an "evidence hierarchy" when creating its criteria.[288]  From these facts, Defendants' contend the

---

[280] 29 C.F.R. § 2590.712(c)(4)(iii)(Example 4)(i).

[281] *Id.* § 2590.712(c)(4)(iii)(Example 4)(ii).

[282] *Id.*

[283] *See AR* at 1–44.

[284] *AR* at 7477.

[285] *AR* at 40–43.

[286] *Plaintiffs' Motion* ¶ 54; *Defendants' Motion* ¶ 13.

[287] *AR* at 7502.

[288] *AR* at 7502–03.

LOC Guidelines and MCGs were developed using comparable processes.[289]  Plaintiffs do not dispute this, and the court agrees with Defendants that the processes are comparable.

As in the example from the federal regulations, the Plan complies with the Parity Act because "the processes for developing" the LOC Guidelines and the application of the LOC Guidelines "are comparable to and applied no more stringently than for medical/surgical benefits."[290]

Third, Plaintiffs' arguments about the differences between the LOC Guidelines and MCGs are insufficient to show disparity.  Plaintiffs first point out that under the LOC Guidelines, admission to an RTC is covered only if "[t]here is a reasonable expectation that service(s) will improve the member's presenting problems within a reasonable period of time."[291]  Plaintiffs correctly note there is not an identical criterion for admission to a skilled nursing facility for asthma treatment.[292]  But the guidelines do not need to be identical, just comparable.[293]  The guidelines here are comparable.  As explained, the same definition of medically necessary applies to both mental health and medical/surgical treatment, and the LOC Guidelines and MCGs were developed using similar processes.  Additionally, although the MCGs do not require that the beneficiary be expected to improve "within a reasonable period of time,"[294] they do require that "services cannot be managed at a lower level of care" and that

---

[289] *Defendants' Motion* at 30.

[290] *See* 29 C.F.R. § 2590.712(c)(4)(iii)(Example 4)(ii); *see also M.Z.*, 2023 WL 2634240, at *20 (concluding no Parity Act violation where the standards used to determine medical necessity were developed in the same process).

[291] *AR* at 2; *Plaintiffs' Motion* at 39–40.

[292] *Plaintiffs' Motion* at 39–40; *see also AR* at 4734–35.

[293] 45 C.F.R. § 146.136(c)(4)(i); *see also James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-38, 2021 WL 2532905, at *20 (D. Utah June 21, 2021).

[294] *AR* at 2.

discharge occur if the beneficiary "is no longer demonstrating significant functional gains."[295] And as Defendants point out, coverage for medical/surgical treatment at a skilled nursing facility or inpatient rehabilitation facility is limited to sixty calendar days per year,[296] but there is no similar limitation for RTC services.[297]  Furthermore, even if the application of the different guidelines "does not result in similar numbers of visits, days of coverage, or other benefits utilized for mental health conditions," that is not sufficient to show a Parity Act violation.[298]

Plaintiffs also contend the LOC Guidelines require that the "admission criteria continue to be met" for continuing RTC coverage, yet there is no similar requirement in the MCGs.[299] While the MCGs do not have an identical phrase, they contain effectively the same requirement.[300]  For example, during "Stage 2" of the treatment course for an asthma patient at a skilled nursing facility, the patient cannot be treated at a lower level of care, continues with their care plan, has an ongoing assessment of clinical needs, and receives education—all aspects of the admission criteria.[301]  At Stage 3, when those requirements are no longer met, the patient is discharged.[302]  So although the guidelines are not worded identically, Plaintiffs have not shown they are materially different.

---

[295] *AR* at 4735.

[296] *AR* at 1709–10.

[297] *AR* at 1852.

[298] 29 C.F.R. § 2590.712(c)(4)(iii)(Example 4)(ii); *see also Michael P. v. Aetna Life Ins. Co.*, No. 2:16-cv-00439-DS, 2017 WL 4011153, at *7 (D. Utah Sept. 11, 2017) ("[T]he difference in requirements is not necessarily an improper limitation on mental health care, but recognition of the inherent difference in treatment at those facilities.").

[299] *Plaintiffs' Motion* at 40–42.

[300] *See AR* at 4734–35.

[301] *Id.*

[302] *Id.*

In sum, the guidelines Plaintiffs highlight are not identical.  But the same medical necessity limitation applies to both mental health and medical/surgical treatment, and the guidelines for applying that limitation were developed using comparable processes and are applied comparably.  Accordingly, Plaintiffs have not presented sufficient evidence to show a Parity Act violation, and Defendants are thus entitled to summary judgment on this claim.

## III.    Prejudgment Interest, Attorney's Fees, and Costs

Plaintiffs request the opportunity to present additional briefing on why they are entitled to prejudgment interest, attorney's fees, and costs.[303]  Prejudgment interest is available in ERISA cases, and the rate "'rests firmly within the sound discretion of the trial court.'"[304]  At the court's discretion, reasonable attorney's fees and costs are also available to either party under 29 U.S.C. § 1132(g).[305]  "However, courts should not grant attorney's fees under this provision as a matter of course."[306]  The court will allow Plaintiffs' to submit briefing on prejudgment interest, attorney's fees, and costs, but only for the portion of the Denial of Benefits claim they were successful on.[307]  Plaintiffs have thirty days from the entry of this Order to submit their brief. Defendants will have thirty days to respond.

---

[303] *Plaintiffs' Motion* at 43–44.

[304] *Weber*, 541 F.3d at 1016 (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1287 (10th Cir. 2002)).

[305] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 244 (2010).

[306] *M.S.*, 553 F. Supp. 3d at 1041.

[307] *See Hardt*, 560 U.S. at 245 (explaining a court may award fees and costs "as long as the claimant has achieved some degree of success on the merits" (quotation simplified)).

## CONCLUSION

For the reasons stated, Plaintiffs' Motion[308] is GRANTED in part and DENIED in part.

Defendants' Motion[309] is also GRANTED in part and DENIED in part.  Plaintiffs are entitled to

benefits from February 11 to March 15, 2019, but are not entitled to benefits from March 16 to

August 6, 2019.  The court REMANDS to United to provide a rationale for the denial of benefits

from August 7 to November 4, 2019.  Defendants are entitled to summary judgment on the Parity

Act claim.  The court invites a motion from Plaintiffs for prejudgment interest, attorney's fees,

and costs.

SO ORDERED this 28th day of July 2023.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[308] ECF 38; *see also* ECF 36 (Public Version).

[309] ECF 59; *see also* ECF 41 (Public Version).